and will counsel for the parties on People v. Gonzalez approach. Please tell us who you are, who you represent, and how much time you'd like. Good afternoon. My name is Drew Wallenstein. I represent People v. Gonzalez. I'd like to reserve five minutes for questions. And how much would you like for your argument in chief? Oh, you're the only one on the calendar. We won't hold you to it. Yes, I think, as I'll discuss in my intro, I haven't heard of him. I'm not so inmate. How's this? We'll let you know when we've had enough. Okay. All right. Hi. I'm Erin O'Connell on behalf of the People, and I would stay around 20 minutes for my argument. Okay. All right. And Mr. Wallenstein, whenever you're ready. Good afternoon. As I said, my name is Drew Wallenstein. I represent the opponent, and I know Gonzalez. As I mentioned, there are five issues in this case, four of which are substantive. As I said, each of those issues raises a number of interesting questions. We could spend a large amount of time on each of them. I'm going to begin by talking about two of these. Yes. Let me help you out here. We've read the briefs. Okay. We've looked at the records, and we're familiar with the case. Okay. Then I'm going to begin by focusing on issue two, which is compulsory during their issue four, which is complicity. Of course, I'm completely prepared and will answer questions. If I have time left, I will get to those issues as well, talk about them in a little bit more detail. As I mentioned, issue two was compulsory during them. As a brief factual summary of what happened in this case, he was originally charged by information in 2013 on a nine-count indictment on information. Okay. Of those nine counts, there were two counts of criminal sexual assault, three counts of aggravated criminal sexual abuse, one in decent solicitation, and two counts of sexual exploitation of a child. The only two counts to mention, both of the complainants in this case, A, B, and D, are sexual exploitation of a child. The parties are, as far as submitting briefs, are in agreement that if the new indictment, which happened in 2015, involved the same acts as that 2013 indictment, compulsory during it would apply, and therefore the new counts that are in that indictment would require to be dispensed. Let me then talk to what does it mean to be the same act. There are a couple of things I want to draw attention to. The first is that the sexual exploitation of a child, the facts alleged in that case, are intermingled and have the same nexus as the other facts in the case. The sexual exploitation of a child- It's alleged that they happened on the same day. I'm not sure if they're necessarily interrelated. Well, they're interrelated in this- The course of removal of the clothing was a necessary part of the sexual touching, which is the issue of the other counts. So I would say they are interrelated because they happened in the same series. The fact, one of them is essentially a precursor to the other one. And while they don't have the same elements, this is distinct from like one act on crime, where the acts have that same element. In this case, they don't have that same element. And a direct to people versus Hunter versus 2013 Illinois Supreme Court case argument. I'd also talk about several cases like Williams versus the 2003 Illinois case, where murder and contributing to the delinquency of a minor were found to be the same act because those two cases, those two certificates, shared the same facts. Do you agree that compulsory joinder does not apply if the charges stem from independent acts constituting different offenses, even if those multiple offenses arrive from a series of related acts? I would agree that if they are different acts, yes, compulsory joinder does not apply. Does not apply if the charges stem from independent acts constituting different offenses? Yes. But isn't that what we have? It's independent acts out of contract. Well, I think the context given by the cases on this, as I mentioned, Williams, there's also Miskakopoulos and Hunter, is that when you're trying to determine what is, whether they are the separate offenses for the purposes of compulsory joinder, their shared factual basis is applicable. Because part of what is at issue is, could you try this in a separate trial? That's kind of what Gooden, the case cited by the state, that was one of the primary reasons behind it. I thought that you could have multiple offenses arising from a series of related acts. That in and of itself does not require compulsory joinder. Well, I think in this case, compulsory joinder is required because you could not separate out these two acts. Therefore, when the initial information was brought, compulsory joinder requires all the related charges. Well, that's not true. I mean, he could have gone so far and no farther. That would have been a separation of the two acts. I'm sorry, I'm not buying it. I mean, if you're talking about exploitation, you could have exploited the children without abusing them or assaulting them. That's possible, but the reverse is not true. So the new charges are all based on touching. So the touching could not be separated out from that sexual exploitation. You could not have a separate trial based on the touching of EX and then a separate trial about the sexual exploitation of a child based on the EX. So I would say that based on that reasoning, which has been used by the Supreme Court, as well as the fact that they do share common facts which overlap, and I think in a lot of significant ways, for the purposes of compulsory joinder, they are the same act. I would also, you know, a couple of things important to note, which is that the Attorney General at the time of the new indictment specifically made note that there was nothing new. Nothing new was learned in the course of this. There's no new information. Nothing had changed. So from the perspective of the prosecution, all the facts were known at the time. The fact that the original information contains allegations of EX shows that the prosecution had knowledge of the charges that eventually appear in the 2016 indictment. Are you saying that the Attorney General has conceded that the 2015 indictment, there's nothing new from what was indicted in 2013, of the charges in 2013? I'm sorry, I think I missed the beginning of the question. I mean, you're saying the Attorney General, in their filing 2015, said there was nothing new. Correct. So are you saying that they conceded the issue that you're presenting with regards to compulsory joining? No, not the entire issue. They conceded the element of the issue, which is that the state had to have knowledge of the new charges that were brought for compulsory joinder to apply. So if there was some question as to whether or not the state had gained new information, in the interim between the original information and the new indictment, then compulsory joinder may not apply. However, in this case, the state did concede that there was nothing new about this. They knew all the information in 2013, they just didn't do the correct charges. So now they were going to reindict them on new charges. I will also point that the case primarily relied on by the state, Pupil v. Gooden, as I mentioned, one distinction there between that case and this case is that the charges in this case could not be brought to separate trials. The second distinction is that a lot of courts analyzing Gooden after notice that it does not really comport with other Supreme Court cases on this issue. It's more of an outlier. And in Gooden, there was a unique quirk where some discussion was had as to whether or not some of the dates could be applied to the defendant even with compulsory joinder. We don't have any of those issues in this case. It's clear that after these 700 plus days, if compulsory joinder applies in this case, then the new charges must be dismissed. And House was ineffective for failing to bring that to the court's attention and argued that the charges should have been brought originally, but were not. Well, my understanding, and tell me if I'm wrong, 2015 charges only applied to ES. The new charges? Yes. Yes, essentially... And so there were only two charges before regarding ES. Yes, the two sexual exploitation of a child in 2013. Then in the 2015 indictment, essentially there's mere charges. One count of criminal sexual assault, and then the two counts of aggravated criminal sexual abuse for each of the complaints. So in the original 2013 indictment, as I mentioned, there were two counts of criminal sexual assault, both talking about AV, three counts of aggravated criminal sexual abuse, all talking about AV. So we're just looking at whether the counts in 2013 on ES and their relationship, if any, to the 2015... Yes. And the two counts that specifically mention ES are the sexual exploitation of a child. Specifically mentioned the coercive removing of the clothing. In the 2013? In the 2013. Right. Yes. And then obviously the 2015 indictment is talking about touching. Is that different? Yes, it's different in the sense... It's different in some sense, but it shares the same nexus effect. Just as I mentioned, for instance, as I mentioned, Williams, which is talking about murder and contributed a delinquency of a minor. In terms of elements, those are clearly very different crimes. We would, as I think you quoted earlier, we would actually say those are separate offenses. But for the court in Williams, it didn't matter because it shared the same facts, and thus the fire joined it. But I found multiple offenses can arise from a series of related acts. And these acts are related. That doesn't prohibit... That doesn't require a jointer. Well, I think by the definition of compulsory jointer, these are the same act because their shared facts are so close that even though they are distinct offenses with different elements, they're the same act because firstly, they share that same factual background, same factual nexus, and as I mentioned, it would be impossible to try these as separate cases. That indicates that they're actually interwoven to the point where, yeah, you can't just pry one out and suddenly say they're not related. I would also point to Miskopoulos, which is this court's decision in 1988, which talks about how theft and forgery, which are based on the same facts, because the defendant exerted unauthorized control, were the same acts for the purposes of compulsory jointer. Now, obviously, theft and forgery are different offenses. They involve very different elements. And you could even say they are distinct offenses. But because they share this common factual basis, this court in that case found that, yes, compulsory jointer applied because they were the same act for the purposes of compulsory jointer. I do have to emphasize again that when we think about acts, we tend to want to think about one act of crime where we're thinking about, like, do these share similar elements? Are they, you know, are they distinct enough that they would have to merge? That is not what's going on here. This is a very different kind of analysis of acts. This is looking at facts. This is looking at circumstances. And this is kind of more specific of an analysis. It's not based on the elements. So, if we find that these acts are distinct but related in the course of a single act, a single incident, would, then we would not necessarily, then I think you lose. Well, if you were to find that they were different acts, yes, they would require that they be related. They can be related. What I'm saying is it's okay if they're related. You seem to, you say single act. I mean, as if they have to be, because they can be related. Right. I mean, it's kind of the issue with the way the course describes this, which is we're talking about a single act, but that single act can be broken up into kind of subcomponent actions by a defendant. So, if you were to find that, yes, there is no relation between those subactions or subacts and that, therefore, that they don't share some kind of common basis or, you know, they wouldn't have to be tried at the same trial, then, yes, you could maybe reach that. But I think in this case, that finding can't be had because there is a clear nexus between the charges that were brought in 2013 and the charges that were brought in 2015. And you're referring only to ES, right? With respect to what happened in 2013? You're saying that the sexual exploitation counts in the 2013 indictment relate to the mirror counts in the 2015 indictment as they relate to ES. Yes. They argue that they're based on the same act because they have this shared factual basis and they could not have been tried separately. But, you know, obviously, these counts with respect to AB, you know, those are not an issue because they were charged in the 2013 indictment. They're still charged in the 2015 indictment. And there is no change other than there was a fourth count of aggravated criminal sexual abuse brought in the 2015 indictment, but AB was, there were three counts of aggravated criminal sexual abuse against AB, the original indictment. So that obviously would not, would only really apply to ES, right? If there are no further questions on that, I'll turn to complex. So this is issue four. As a brief factual reminder, Mr. DuBois was represented for over nine months when it was clear to everyone involved that his attorney had prosecuted him in a previous case, that the case may have been an issue at the trial, and that the attorney could have been a witness. You say it's clear. That's the issue. Why is it so clear? I mean, the fact is it just continued it because there were questions of what the state might do or might not do. It wasn't so clear. And, in fact, nothing happened during that nine-month period until there was some briefing and during that period to see what the state was going to do. It was, they were waiting to see what was going to happen. Well, if I can respectfully disagree on two points of that. The first is that whether or not the state was wavering on whether to bring the other kind of evidence, I can talk about the impact of that. But that did not establish the first act conflict. The first act conflict is that he prosecuted him in a case that was. . . But he interviewed him. I thought he. . . He interviewed him as part of the prosecution. Yeah, he took a statement. Yes, he took a statement as acting as the prosecution against him in a previous case. But he was willing to waive that. As I understand it, according to the record, he was willing to waive that. But it's a whole different matter if that was going to come in in the case against Mr. Gonzalez. Well, I would make a couple points to that. Firstly, I don't believe this conflict could have been waived even had. . . But he. . . Even had the state said, we're not bringing the other kind of evidence. Because there was always some risk that this would become an issue at the trial. Well, I don't know that. You know, that's speculation on your part. But we don't need to speculate because we know what happened. And as soon as they have the judge, you know, you're gone. Well, let me take a step back as well, which is that Mr. Gonzalez was never at loss during this entire nine-month period. He was never told what he was risking by having a person who acted as an agent of the state in a previous case. And that that person may actually. . . That that case may become an issue at trial. Mr. Gonzalez was never told, okay, here's what the implications of that are for your rights, and then you can make an important decision. So his waiver was not made. . . We can't assume or presume anything about his waiver. But the court never accepted the waiver. Right? Right. So we don't have to worry about that. And nothing happened. During that period of time, they were going to find out what the state was going to do. Well. . . I mean, I can't. . . Let me. . . You seem to be jumping that issue. You're saying that just the fact that he interviewed Mr. Gonzalez, irrespective of whether that was going to come in as other crimes evidence, should have immediately resulted in a disqualification. Is that your position? Well, let me talk about a couple of things. Let me answer my question first. I would say not necessarily, but what it would have required was the court to take significantly more action than it did to ensure that his rights were not compromised during that period of time. Well, is there anything in the record that showed his rights were compromised during that time? Yes. I can talk in a little bit of detail. Plea bargaining occurred during that entire period of time. The first that this was brought to the attention of the court was August 29th of 2013. In January of 2014, they had their first argument on this. So already five months have gone by, and plea bargaining is still going on. The state then says, oh, we're not going to use the other crimes evidence. Then at the next hearing, the state says, because we're so far apart, we are going to use the other crimes evidence. Which is striking, because it's essentially implying, in some sense, that because the attorney representing the person is far apart on this plea bargaining, that now we're going to introduce something which could produce a conflict. And the court at that time even says, this creates a conflict. Now, the court then doesn't resolve it for another three or four months. And at that time, the state withdraws all of its offers. So this entire period of time, Mr. Gonzalez is represented by an attorney that, under law, is conflicted. He was never admonished about what the consequences of that are. So he has absolutely no idea what that means or what the impact of that is on his rights. During that time, that attorney is negotiating with the state as to reach some kind of settlement. The state, on the basis of that negotiation, says, we're not going to do other crimes evidence. And then when the negotiation doesn't go their way, they threaten to introduce other contracts. Which is extremely problematic from a sense of what Mr. Gonzalez deserves from fair counsel. The issue as to whether or not his counsel can be conflicted out, it shouldn't come in. The court should have taken the necessary protective steps to ensure that his rights weren't compromised during this nine-month period. But what you're saying is that as soon as it became apparent that Mr. Gonzalez's counsel had taken a statement from him in an earlier case, the court had to say, you're gone. And you have an affidavit from Mr. Gonzalez saying, I've been told about this, and I want him to stay. So had the court done what you say it should have done immediately, we'd be here on a Sixth Amendment claim. Deprive me of my choice of counsel. Well, I would disagree in two respects. Firstly, I don't think the court had to immediately, it's not like the court had to immediately dismiss him. The court could have done a number of other steps if the court was uncertain as to whether or not something could be done. They could have appointed conflict-free counsel. They could have told the parties, do not do anything on this case until this gets resolved. The only thing we are doing in this case is resolving this issue, and until then, do not do anything. And what did they do when you said three or four months between the time the state said, oh, yeah, we might use that other crimes evidence, and the court finally addressed this issue? Were they still negotiating? Yes, they were still negotiating, and the state ultimately withdrew all of its offers. And I'll mention that that offer was for eight and two, and he ended up getting two consecutive tenure cuts. So there is a significant difference between what was offered and what he ultimately got. It's something to note that at that time, he was represented by counsel that, under law, we have to assume is conflicted because he acted as an agent of the state in one of his previous cases. So I guess I'm not understanding. You say, had he had conflict-free counsel, he would have taken the state's offer? No. I mean, we can't know what he would have done or what he would not have done. We do know that there were negotiations that, compared to what he got, there was at least a potentially reasonable offer. And at the time that he was deciding whether or not to accept it, he had conflicted counsel. Under the law, we don't have to actually show that that counsel didn't perform adequately. You know, People v. Law, which is a 94 Supreme Court case, talks about that, that prejudice doesn't need to be demonstrated. You say we had conflicted counsel. Yes. Not if they didn't bring in the other crimes evidence. If they weren't going to bring that in, which wasn't clear at that point, then there wouldn't have been any counsel. There still wouldn't have been counsel. But she had an affidavit saying he was willing to. Right. But that waiver, we don't know the circumstances of whether that waiver was done knowingly, voluntarily, or intentionally. We can't really, it would be speculation for us to say, of course the waiver would have been accepted because he was never admonished about it or told what the relevance was. So, you think if the attorney was going to just explain to him, look, this is what happened. Now, you remember I saw you once before when you had this other crime. I know you're attorney, this is all client to attorney, and that doesn't work. It only works if the court actually says to the defendant, look, here's what's at stake here. Yes. And the court didn't do that. Yes. And the court didn't do that until way at the very end. Yeah, I would even argue the court didn't really do that. The court just decided at the end, this is not going to work. I'm going to just dismiss you. I don't think Mr. Gazzella is even ever truly right. He already said, yeah, we're going to use this other presumption. Once they kind of settled in and committed. And just to talk about that, I'll talk about, you know, there's People v. Lawson, which I mentioned before, talks about how we have to make every presumption against the waiver. Because conflicts go kind of to the heart of the Sixth Amendment. We can't just presume that, oh, he meant to waive this or all that. There's a strong presumption, which makes it different from many other kinds of waivers, where if a waiver is signed and all that, we may actually presume it is valid. In this case, you cannot presume that this is a valid waiver. And I would argue that the fact that it was not admonished is further evidence that the waiver doesn't have that much relevance and doesn't show that there was no conflict absent other kinds of evidence. There was still a first-day conflict. And I would say that also between the parties, there's not disagreement about this stuff, that there was a first-day conflict and that it could not have been waived given the circumstances that it was held in. And as I mentioned briefly, even had the state said we're not using other kinds of evidence, this case could have still implicated in all sorts of different ways. If, I guess, the way I see the record, the conflict came up, the state and the parties wanted to explore whether this other crime was going to be used in the current prosecution. During that period, Mr. Gonzalez said, I want my lawyer to continue to represent me. When it got to the point where the state said we are going to use this other crime's evidence, it was an unwaivable conflict. And so the court never got to the point where it said, okay, Mr. Gonzalez, if you want to waive this conflict, here's what I have to tell you before I can accept this waiver. Never got there. I agree with that, but the issue is that the court allowed him, despite a conflict, to continue to represent him for nine months. That's the fundamental issue is that there was a conflict. There was a per se conflict there. The court allowed him to continue to represent him for nine months without even doing the basic thing of just telling him what is at risk and what is at stake. So the minute there's a conflict, it's apparent the court has to say, here's what's at stake here. I think if a person, if they think that the client wants the attorney to continue to represent them, yeah, I think they have to admonish them. I think that that's what Illinois law requires. You have to be admonished if any kind of waiver is going to be accepted. If our presumption is that waiver is not valid, the fact that he just said, I want to keep him, we do not know the circumstances of how that came about. And part of it is because our system relies on the court, which is neutral, to tell the defendant what's going on instead of relying on attorneys who may or may not have some monetary interest or some other interest involved in this case so I can either claim it in private. Correct. We do not know what was said between the attorney and the client as to how this waiver was done. Nor do we want to. Yes. We don't want to go into that. But what we do know is what the court did not, which is not tell him what the risks are, admonish him, and then take it from there. All right. So to boil down your argument to one sentence is the error here by the court was it should have admonished Gonzalez at the instant that it became aware of the interview. At bare minimum, given that. That's what you're saying, right? At bare minimum, I would say that. I would argue that the court should have done more. But that's the, at a bare minimum, you're saying. Yes. Admonishing would have gone partly, but at least by not admonishing, you're saying that was an abuse of discretion. Well, I would, yes, I would say it was an abuse of discretion, but the standard in this case is lower than abuse of discretion. So I think based on the facts and what law requires, the court, it's not the kind of decision that we typically see from a court. What's happened is. Why wouldn't it be an abuse of discretion standard? Because the cases on First State Complex talk about that de novo review happens. And in this case, there's no real dispute about the facts, about what happened. There's no question about what happened at these different hearings and all that. There's just an interpretation of law. It's that issue in this case. I'm sorry, I lost my thought there for a second. I apologize. Are you saying that because there was this conflict, Mr. Gonzalez's counsel was per se ineffective during the period of time he represented Gonzalez until he withdrew? Yes, I mean, that's what the case is saying. The case is saying that the attorney's performance is not an issue. If you show a First State Complex and you have six amendment rights during that period, you don't have to get into an analysis of did they perform well, did they not perform well. Even though, as I mentioned earlier, talking about this in the plea negotiations, there's some muddled evidence that maybe it did come to an effect. But I also mentioned lawsuits. We don't even have to show prejudice. Once we establish that there was a First State Complex. How do we establish that when the state has not filed a motion for proof of other crimes? They haven't done that yet. So to me, aren't you hitting the cart before the horse? No, because the basis of the conflict is that he acted as an agent of the state in the previous prosecution for a different crime. That is what created the First State Complex. The fact that he could be in trial, the fact that he could have been a witness, that's like going like three levels deep on it. That's getting to the point where, unquestionably, there's absolutely no way that he could ever feasibly be a suspect. That doesn't mean that there's no conflict, if he could have been a witness. There's still a conflict. He still acted as a prosecutor in a previous extract case that he worked on and actually took his statement, a statement that, I think as we all acknowledge, could have been an issue in this case. As I mentioned before, even if they had said no other crimes, it still could have come up because, for instance, let's assume Mr. Gonzalez takes the stand and gets impeached on this conviction. Let's assume it comes in in some other kind of way, collaterally or, you know, I don't want to speculate too much, but in the realm of trials, there were more than just other crimes that this case could have been relevant. And if any of that had happened, he would have immediately had a conflict of interest, an actual conflict of interest, as opposed to the per se conflict of interest. There are a number of questions on that issue. I'll move on to talk about reasonable doubt. This is issue one, reasonable doubt. There's two components to this argument. The first is that we argue that at trial, the amount of force shown was insufficient to condemn. And the second was that they did not demonstrate penetration. And I'll talk about those in order. First thing I want to highlight is that the criminal sexual assault and two of the aggravated criminal sexual abuse counts are at issue with these. One of the counts for each of the complainants of aggravated criminal sexual abuse is not affected by either force or penetration. So with force, there are a couple of components. First is the actual sufficiency of the evidence, and the second is the temporal concern. I'll talk about that temporal concern first. The first at trial that the state argued and got specific instructions for and was going on a closing argument was that Mr. Gonzalez moved his body to block the exit of E.S. and A.D. after the touching event. I think it's important to emphasize after the touching event. At the time that he moved to block the exit, the sexual contact had ended. The girls had actually gotten dressed and were sitting... Didn't the defendant force down the shorts? Did he force down the shorts? I believe the testimony is that he stuck his hand under the shorts of the underwear. He forced down his hand on the victim? Well, I mean, the testimony is he stuck his hand under the shorts of the underwear. And pulled down. Isn't that the testimony? Well, I don't believe I remember the testimony that he pulled down. But force down is what I have. Did he spread one of the victim's legs? Both victim's legs? I also don't think that there was testimony specifically about the spreading. I believe there was talk that he stuck his hand under the underwear and did the touching. And that's not force? No, because that would be the amount of force necessary to do the act, which is the felonious touching. The force requires more than just the bare minimum needed to effectuate the act. I'll direct your attention to a second district case, Puma v. Vasquez, which is a 92 case, talking about how it's an exertion of power causing a thing to act, move, or comply against its or its resistance. There's also Denbo, which is a 4th District 207 case, which is that it's more than the force inherent in penetration itself. It implies a physical compulsion that they have no choice but to submit. So, with respect to whether or not there was sufficient force, but in this case, those were not argued at trial. The spreading of the legs, the touching, none of that was the basis of the force at trial. The state specifically saw it and only argued that the blocking of the exit by Mr. Gonzalez's body, that was the force and got a specific instruction to include confinement. Turning back just to the question of temporality, as I mentioned, that force came after the completion of the act, and there's a 5th District case, Singleton v. 91, which talks about how the force had to happen at the same time as the assault. If you actually read the charges, it specifically talks about the use of, you know, the use of force as a threat of force in doing the act. So, the force has to be used as part of the act to effect it. In this case, the only force that was alleged at trial, and which is borne out in the record, happened after the actual touching was complete. And based on elementary law, it has to be as part of the act, as part of the compulsion or exertion of power to cause the thing to act. In this case, there was no evidence that Mr. Gonzalez used that kind of impulsion or physical compelling to cause a sexual touch. It only came after when he tried to block the exit. Could the jury reasonably infer that the defendant used force or threat of force? Well, threat of force, I would say no, because there was no evidence in the record at all that he made any threats. There was evidence that he was maybe manipulative or deceitful, but there was no evidence that he ever threatened force or said anything even remotely to that extent. Force, generally, I would also say no. You know, just to talk about this pulling the underwear down and they spread their legs and all that, there's evidence in the record that, you know, each of the girls, without any resistance, was able to push his hand away, close their legs, get dressed, and attempt to leave. He then blocked them, of course. That indicates that he was not hitting their body, using some kind of physical force to constrain them in where they were sitting, or anything like that. So I would say that no inference, I don't think an inference would be allowed where you could say, well, the touching occurred, therefore a force occurred, because he put his hand under the shorts. I think given the specific testimony that came out, that would not be compatible with what came out of the trial. So if there are no more questions on that, I'll talk about penetration. Under Illinois law, criminal sexual assaults or aggravated criminal sexual abuse based on penetration, if it's digital, requires some kind of intrusion. In this case, there was some amount of confusion and ambiguity in the testimony. And I think that that comes from the colloquial use of the word vagina. And that is to say meeting the entire female sex life. However, what was done by the state was to try to clarify that testimony by the use of two exhibits. On those two exhibits, they were allowed to specifically indicate where they were touched. On the exhibit for E.S., the contact is entirely on the vulva, near the top of the female sex life. For A.B., the contact occurs, again, on the vulva, touching the labia, on the right side of the female sex life. However, under Illinois law, that is not sufficient to be penetration. The fact that there was touching or rubbing or even pushing against it is not sufficient for penetration. And that, I can direct your attention to Peeble v. McGeady, which is a 4th District CL1 case. And the law cited by the state is mostly talking about sex organ to sex organ contact, which is a distinct thing from this. For whatever reason, the legislature decided that for digital penetration, they still have to demonstrate intrusion. Therefore, there has to be some quantity of evidence that shows that there was intrusion for each of the girls. I'll also point out that the testimony became so ambiguous that the state had to call a doctor to come and testify that the entirety of Exhibits 12 and 28, which are the diagrams, the superlative marks, that that entire thing is the vagina. So, that's the trial. It's clear that there was some level of confusion or ambiguity, use of words thrown around. But we know anatomically that there is a distinction between the inside and the outside, and the evidence in this case only showed contact to the outside. Therefore, no penetration. If there are no more questions on that, I'll turn to the final issue, which is Issue 3, Batson. In the court here, Gonzales' attorney raised the Batson challenge. He attempted to make a prima facie case, and then the state jumped ahead and gave the gender-neutral reasons as to why it made the choice. At that point, as unfortunately formalistic as it is, under the law of Batson, that means that the case moved from the prima facie step into the second and third stage. Unfortunately, there is no turning it back, and that is what Davis and Hernandez, which is the United States Supreme Court case, talk about. That once you make the step into second and the third step, you're there. You can't walk it back. The court, unfortunately, tried to walk it back. The court, unfortunately, said, well, I don't find it a prima facie case, and I believe what they said. But the court also did not allow the defense to make any response. Did Mr. Gonzales' counsel say, wait a minute, Judge, you need to hear from me before you accept these reasons for the prompt reasons, not pretextual? Yeah, there was no specific. He didn't specifically say, I believe what... He didn't say, I object. He didn't say, I'm entitled to be heard. He did renew the objection after trial, but yes, that is the case. However, I think in the circumstances where the state jumps in with neutral reasons and the court says, I don't think you met the first stage, and I'm going to listen to their gender-neutral reasons in making that determination, there's not much of a window to jump in. I mean, I suppose you could have just jumped in and said, well, I still object. But I'm not sure what that would have accomplished in terms of... Jumping in, when the state in a Batson hearing offers the reasons for the exercise of its prompt reasons, then it's the defendant's turn to say, but Judge, look, these are obviously pretextual because look at all the other things they've done. So what you're saying is, it wasn't the last part of that. So I don't understand why Mr. Gonzalez's counsel would have been at a disadvantage at that point to say, Judge, before you resolve this issue, you need to hear from me. We're now at stage three of a Batson hearing. Well, I think that the judge did resolve it. That's kind of the issue is that the state and the court kind of jumped ahead. The state decided to unsolicit it, give its gender-neutral reasons, and then the court decided, all right, I'm just going to end this now, say you didn't meet the prima facie case, and here's all the reasons why I believe the state. The court didn't make any of the specific findings that Davis requires, didn't talk about the credibility of the prosecutors, credibility of the witness, didn't do anything else that a second or third stage Batson hearing would require. So even if it wasn't just preventing the defendant from speaking, which I would argue the court did do by taking the step saying, I don't agree with your argument, I'm just going to rule, the court also didn't make any of the necessary findings or do any of the procedures that Batson required. The court kind of tried to collapse it all down into one thing, tried to decide after taking the state's response that it could rule it wasn't a prima facie case, and then go from there, which unfortunately under ONOA law, if you muddle up the different parts of Batson, you have to remand for more Batson proceedings. And as I mentioned before, it is very formalistic, but the Supreme Court does what the Supreme Court does, and that's just how it is. If these things get muddled up, if they get muddled up, we don't have a complete record. So for instance, in this case, we do not have a complete record of what the potential jurors were like. We don't have any information about different people's composures or their tone or anything like that. Why does that matter? What we know about each of these individuals is that Mr. Batson was a defendant of murder trial, right? Brown, charged with domestic battery, solicitation of sex, criminal history. So that was fine.  Of course, there was legitimate neutral reason as well, because of his youth, lived at home, and kid. Well, there's a couple of things I would say about that last one. Firstly, we don't know. Here's some of the kind of findings that could have been made. Let's just say for the sake of hypotheticals, that there was also a young woman who was sick, or that the state did not attempt to. That could be irrelevant, because it would show that it was not a gender neutral reason. That they did it because he was a young man. Enough. But as I said, the court making those kinds of findings prevents us from having to do the kind of speculation I'm having to do right now. We don't know what the witnesses were like. We don't know how the prosecutor's demeanor was. But again, it doesn't really matter as to those two. Right. Possibly. The only one possibly is Hampton. Possibly. It so happened that most of the court of the year was made up of women. It so happened. And if you look at the percentages of the men versus what actually occurred with regard to the jurors and the alternates, the percentages are virtually the same. Well, I'll say a couple things to that. Firstly, if even one witness is struck for an improper reason, it's problematic in effect. It doesn't matter if two of them are okay and the third one is a problem. The second thing I'll say is that in this case, even if it would have been the case that those findings were relevant, Davis still says the court has to make those findings. So that when we're talking about this on appeal, we're not going into the realm of speculating about what this person was like, what that person was like. Yeah, maybe it wouldn't have mattered, but courts have to make findings that sometimes don't matter. And in this, under the law of Babson, as interpreted by the Illinois Supreme Court, courts have to make findings that the second and third states. The court did not do that in this case. In addition to preventing the defendant from even making an argument that those were not gender neutral reasons. So you're saying that the court made no findings? The court made a finding that it was not a prima facie case and that they agreed with the state's gender neutrality. That was essentially the extent of the finding. There was nothing specifically to, there was no specific fact finding as to, you know, what the jurors were like, what the interactions were like, other things that may be considered. And I think that part of this is complicated by the fact that the defendant was not allowed to speak and say, I disagree with the gender neutral reasons. If he had been allowed to speak, maybe we would have more of a, maybe he would say something that would give us information that we don't currently have. Again, this is just speculation. We're speculating what some of the arguments against gender neutrality would have been. Because we don't have, Mr. Gonzalez did not have anyone able to argue for him, or Mr. Gonzalez representative was not allowed to argue his case as to why they were not gender neutral reasons. All right, we're, I think we're done for now. We will give you some rebuttal. All right. All right. Ms. O'Connell? May it please the court, counsel? I'm hoping to limit myself to just a few responses to some of those arguments. I'll start where counsel left off, which is the Batson issue. I would emphasize here that we do not have a muddled record. What we have is two clear findings by the trial judge that this claim failed both at the first stage and at the third stage of the Batson procedure. The defendant focuses on his inability at the second and third stages to give a response to the neutral rationale, but he didn't get, he wouldn't have that opportunity unless he first satisfied the first stage prima facie showing. But isn't the, whether there was a prima facie showing moot once the court moves beyond that? In a way it is in that the court can go on, this court in review can affirm alternatively the third stage finding, but he's asking at this point for this court to remand. For him to get a new Batson hearing, he does have to make the prima facie first stage showing. So the court can just affirm that determination based on the record. There had been no prima facie showing here. As the court noted, the veneer itself was definitely skewed female, and the resulting percentages of the male jurors were equivalent to what was in the veneer. With regard to Mr. Hampton, that one, he said he never had an opportunity, his counsel, counsel that was his counsel, never had an opportunity to see him. Well, I would dispute that counsel didn't have the opportunity. I think counsel could have objected at that point, as was discussed, that counsel could have affirmatively stated, I have a reason to believe this one is pretextual. But even with respect to that one, counsel doesn't get to make those arguments unless he's made a prima facie showing first. And the record shows in this case, especially at the time of the Hampton strike, the prosecutor was using the final remaining peremptory strikes against female jurors, and had at that point, at the time that Hampton was struck, actually had left at least three male potential jurors on the panel. One of those was seated on the jury, I believe, and two were alternate. So that's strong evidence that the state was not exercising its peremptories in such a way as to discriminate against male jurors. I wanted to quickly address the issue of the conflict of interest. Just to emphasize that there are two important rights that are at stake where a defendant has potentially conflicted counsel. The first is that defendant is entitled to a conflict-free counsel. The second is that defendant has a right to choice of counsel. So the trial court has to balance those two rights when it's considering a request by a defendant to waive a potential conflict. And I would emphasize that in this case, that was an argument that was actually made by defendant to his counsel that this was a potential choice of counsel issue. That's in the record at L6. But shouldn't the court have admonished? I mean, that was part of the argument of counsel. Of course, still, whatever else you say, there was no admonishments, and the court had an obligation to do so. By failing to do so, we have a constitutional issue. Well, the admonishments are important in judging the validity of the waiver. I think the defendant was fully aware of the circumstances. How do we know that? Well, he did sign the written waiver setting it out. The fact that a neutral would give the admonishments, that's why we have admonishments. Correct. They may still be referred to by the counsel in private, but we don't know for sure one way or the other, and that's why we have admonishments. And that's true. And certainly if the court had accepted the waiver, I think the admonishments would be more of an issue at that point to see whether those were adequate to support the waiver. What Mr. Wallenstein is saying is that while the court was deciding whether it was going to accept the waiver and give the defendant the admonishments, the case was moving along. And so Mr. Gonzalez was being represented by counsel in plea negotiations who had a conflict, and without knowing the exact ramifications of that conflict, which is troubling. So I would agree that the plea negotiations were ongoing. The rest of the case kind of did come to a stop while they litigated the issue of counsel's conflict. The negotiations aren't nothing. That's true. Correct. And I guess I have two responses. One is to emphasize that the nature of the conflict here is not something that would have arisen at plea negotiations. It was something that would have affected the ability of counsel to respond to certain trial evidence. But the other issue that was at stake here is that the state was deciding whether it was going to introduce this other kind of evidence. So the parties went back and forth as to whether it was going to ripen into an actual conflict. This case is here mostly and almost entirely on procedural issues. We have to decide whether or not the trial was done correctly. That's our job. And you have an attorney that has a clear conflict of interest. Almost right from the beginning they know that. The court never says to the defendant, Mr. Gonzalez, here's what's at stake here. Here are your choices. Let me explain them to you so that you understand them. We don't know what the attorney is saying to his client. We do know what was in the signed waiver, which is fairly detailed. Okay. And the plea negotiations were ongoing. One important fact to note is that they didn't stop with conflicted counsel. They continued with new counsel, the plea negotiations. They actually made a record before trial that there had been ongoing negotiations and they just fell apart. I believe the defendant has admitted here that he was given a 10-year offer that he rejected. And so the reason that those fell apart was not even due to counsel's failings but due to his own decision to take the risk of going to trial and getting the greater sentence. But I would emphasize that the uncertainty here was the court didn't know what to admonish him until it became clear that the evidence was going to be introduced. I'm not sure I agree with that. The court knew that there was a conflict. The court saw that there was a conflict. It knew it. And if we took the position that courts don't have to admonish people until they're certain that A is going to happen instead of B is going to happen, then there's – I don't even know how courts would decide that because you can't predict the future. No court can predict the future. So if an admonishment is necessary because of a conflict, wouldn't it be better to just spell out, hey, do it right at the beginning. Let the defendant know right from the start what's at stake here instead of fiddling around, waiting, relying on somebody, relying on somebody, and then finding out, oh my gosh, there was a conflict here and I may not have understood what that was. Sure. And certainly there's a distinction to be made, I think, between what would be the best practice here and whether what the trial court did in this case was an abuse of discretion. So I do want to just emphasize that there was a lot of uncertainty amongst all parties involved as to when this would become an actual conflict. So most of the delay at the hearing is learning whether this was going to come to fruition. And the minute that it became clear that it was, the court said, I'm not going to accept your waiver. Certainly, if the court at that point had gone on to accept the waiver, the court would have had the obligation to very clearly spell out for a defendant what the potential ramifications were. But we're actually in an unusual place where we all agree that at the end of the day, the trial court did the right thing. The court denied the request to waive it. Well, I'm not sure we can agree on that. And what if we agree that the court should have made this admonishment at the beginning instead of waiting until halfway through the negotiations? You're saying we can all agree on that. I don't know if we can all agree on that. Well, we agree that the court shouldn't have accepted the waiver because ultimately the court didn't accept the waiver, and that's not being challenged now. I do think that there is room for debate as to whether the court could have given him clear admonishments at various stages. But what the court did, and the delay was that the court was making sure that it fully understood what the conflict was going to be. And the parties all came to an agreement, actually. At the end, counsel himself said, well, I'm conflicted. Well, but that requires the court to have a crystal ball, and they don't. So right at the beginning, you know there's a conflict, and I'm saying take the crystal ball out of it. What happens if you say, you know what, don't worry about what might happen, what could happen, what should happen, what we think won't happen. Deal with the conflict. Maybe that's the right way to do it. I don't think that the court agreed at the outset that it was a conflict. What the parties seemed to be addressing was that it would become a conflict if this was going to be evidenced at trial. There was a greater dispute, certainly if the evidence had not been introduced. The defendant is now saying, well, my counsel still would have been conflicted because he had been in an adversarial role to me. That argument might have come up, but it wasn't a disqualifying conflict until it was clear that this evidence was actually going to be presented by the state. And at that point, everyone agreed. And the court itself, I think, at the end, reached the right result in agreeing not to allow the defendant to waive. And I would say at that point, the admonishment to that point would need to be clarified before any sort of a waiver was accepted. But because it wasn't, what we're really debating is whether the court erred in its delay. And the two points I would just make, and I may have already made them, but one of them is that the pre-negotiations were the only thing ongoing and those continued with new counsel. And the court actually postponed any further substantive matters. So, for example, the next issue in line was this motion to admit other crimes evidence. The court said, you're conflicted and I'm not even comfortable having you argue with me about the merits of that motion. We're going to get new counsel in and counsel's going to argue that motion for the defendant. At this point, it had become clear that this was a disqualifying conflict. And the court actually recognized that and did disqualify counsel at that time. And the court itself, I should also note, did express quite a bit of frustration, I think, with the parties that this was taking so long. So, it does seem like nine months was an awfully long time to come to this. But the parties between them went back and forth a little bit on whether this evidence was going to be introduced or not. And then finally, once everyone was on the same page and that motion had actually been on file and everyone agreed that it was a conflict and the case then was able to proceed expeditiously. But the court definitely didn't like the fact that this was in limbo for so long. It sounds to me that the defendant is taking the position that the court should have provisionally admonished him, recognizing that he's not waiving anything at that point, but should have provisionally admonished him and then maybe really admonished him when it came down to are you really going to waive the conflict or not. Right. And that might be a best practice, but the point is just that there's no law, no case law at this point, saying that that's the only option that the court had. So, the court was operating in this murky pretrial proceeding where it was unclear if there was a conflict or not and whether he wanted to waive that conflict or not. And at the end of the day, I think the court did reach the right decision on that and I think the defendant would agree. If the court had allowed him to waive the conflict, certainly it would have needed to provide better admonishment. At the time in 2013, when this came up in December, how, if at all, should we consider the affidavit of Gonzales, which is a very thorough affidavit. Right. And here he is saying, I want this lawyer, which he has an opportunity to. So, we're kind of in a box where we have two different rights that are kind of being put up against us. The conflict versus the right to that attorney. Right. And in the affidavit, Gonzales says that he could obtain alternative counsel, either private or when appointed at no cost, that he's not being charged by grace for any services since the conflict was realized and that he immediately informed me of the conflict. He understood the perils of the continued representation. He understood that if they were to continue to represent him, there could be a possibility that he may be called as a witness against me and that he would then be required to withdraw. He further acknowledges that he has spoken extensively about the conflict and the problems and so forth. So, how should we consider that affidavit, if at all? I think that's good evidence that the defendant was, from early on, aware of the potential ramifications here. So, that would tend to lessen the need for the court to also provide him with the detailed admonishments about the conflict that was at issue. What about the counsel's statement that we should look at this de novo? I would disagree with that because the court's not reviewing the propriety of the court's legal determination that he couldn't waive the conflict. The issue is, did the court err in taking the nine months, or however long it was after the filing of the motion, to reach that determination? And that's the sort of trial court management that this court would typically defer to the trial judge and review under an abuse of discretion. So, I actually disagree that there is any sort of legal determination actually under challenge. The point was that the court had yet to make that legal determination. So, that would be probably... How do you disagree with that? On the standard of review, I do. Okay. Yes. And then, I just wanted to reach one final point on the sufficiency claim, just to clarify the people's theory at trial here. Defendants correct that consignment was the theory, and the jury was instructed on that. The theory was that the use of force was that he overcame the victim by use of superior strength, superior size, or physical consignment. What defendant gets wrong is in saying that the only evidence of that consignment happened after the actual assault had taken place. The consignment began the minute that defendant got both of the victims into his car, into a place where they were away from view, where they had a limited room to evade his assault. The locked car? The car was locked? Exactly. Yes. EF actually did testify that the door was locked from the beginning. And then, the fact that he blocked their exit just underscores that this consignment was how he was effecting the assault of the victim. This was clearly delivered on his part, not just respect to them, but he had a pattern of this conduct, actually. The other kind of evidence that finally came in was that he had taken a girl in a parking lot, pretended that he was a security guard, gotten her into his van, and then when she was there, he sexually molested her. So he certainly knew that this was a way to accomplish assaults of sort of, I would guess you'd say, trusting young women who got into his car under false pretenses. And then, I don't want to belabor the second sufficiency issue on the penetration, other than just to note that any intrusion, however slight, and the court should, of course, focus on the words that were actually used by the victims here in terms of pushing in, pressing down, pushing inside. These are quotes from the victims reflecting that there was an actual intrusion, and I don't think at this point we're even disputing that it was an intrusion into what's properly considered the sex organ for purposes of the statute. And unless the court has further questions, we would add one. Do you want to address compulsory joinder? Yes. So I think that the issue that is being presented here is whether the removal of the clothing is properly considered the same act as the actual sexual assault itself. They were plainly two acts as far as the defendant was concerned. Even assuming that they were interrelated, the law is clear that they have to be the exact same act for the compulsory joinder to apply. And if they're not, if it's just a precursor or it's just part of the same transaction, that doesn't preclude the state from bringing the additional charges down the line. And that is what took place here, is that the state added the additional charges of the actual assault and the penetration, which were not alleged initially. All right. Thank you. Thank you, Ms. O'Connell. Mr. Wallenstein, very briefly. Just briefly, starting at that last point. Outer law does not require that they are the same actual. They have to share the same factual basis for compulsory joinder. So how does removing clothes share the same factual basis as sexual assault? Because it was part of the scenario that led to that touching. The necessary prerequisite for it. Justice Hyman asked you about can't a series of acts be separate? Yes. So compulsory joinder doesn't apply, even if they're all part of the same incident. They can. I would argue in this instance they cannot because of the facts of this case. And as I argued, they could not have been tried separately. Those are two things that may have been distinct. Some may be a different thing. The theory is that removing clothes is the precursor to the sexual assault. So there had to be choices. Well, the allegation was that it was the coercion that caused that. That was part of the allegation to the run-up to the sexual assault. And that was what's argued in the response brief, which is that the coercion was part of the sexual assault. That's what was argued on Issue 1. So I would say that they are interrelated. There is a relation between the coercion of the removing of the clothes and this sexual assault. With that said, I'll talk about conflict for a little bit. As Justice Hyman mentioned, it feels like you're squeezed between two different boxes. I would argue you're not squeezed in two different places because the law tells you that you presume against a waiver. You make a presumption against it. Therefore, it requires more than just what we would typically require for a waiver of other things. So if he had been denied this counsel, I don't believe there would have been any choice of counsel argument now. For a number of reasons, and as I said in the main part of the argument, there are multiple layers of conflict in this case. There is no way to extract that conflict. So even if he had really wanted him as the attorney, the fact that conflict goes so deep to the Sixth Amendment and the protection of a defendant's Sixth Amendment rights, and that we presume against the waiver of that, I don't think the fact that he wanted him to stay out of counsel would have created any choice of counsel. So if we agree with the State that this is an abuse of discretion, your position is the only discretion the trial court had when it became aware that Mr. Grace was part of the prosecution in an earlier case. Was it to say, Mr. Grace, you're out? No, I don't think that the court had to say, Mr. Grace, you're out. The court could have done any number of things. Step one would have been admonishing him. Step two would have been... Admonish who? Mr. Gozals. Okay. What is he going to admonish him on? Because he hasn't waived anything. He hasn't done anything yet. So are these provisional admonishments? Well, the thing is that I think when the court does not take any action and allows Mr. Grace to continue to represent him for nine months, the court is not making an explicit finding, but the court is essentially taking an action, which is to say, I'm going to allow a conflicted counsel to continue to represent this defendant. I'm not going to take any action to ensure that his rights are not compromised in the middle of that. I'm not going to admonish him as to the risk of that. So when he says in his AFJ that I'm very aware of the perils and I've been admonished and I'm just going to... Right. I mean, that's the scenario between the attorney, the conflicted attorney, and the client. That's why under law we require the admonishments, because we don't want to be plying into what goes on in there. We don't want to have to date our records on, okay, well he signed something that his conflicted attorney told him to sign and then took a step in there. So what the trial judge should have done is say, okay, I don't know whether the state is going to use other crimes evidence or not. If the state decides to use other crimes evidence, there's no way that Mr. Grace can represent you. But while we're deciding that issue, I'm going to admonish you about what's going to happen between now and the time I decide the issue, because you tell me you want Mr. Grace to stay on as your attorney. Right. Yes. Where is that in the rules? Where is that, this kind of provisional admonishments? Well, I mean, clearly there's not anything to that level of specificity in the rules, but I think it's just this is such a unique circumstance, that somebody with a per se conflict of interest, which the parties agreed could not have been placed, would have allowed to continue to represent a client for nine months, argued and fought against being dismissed, and during that time, acted at a time where Mr. Gonzalez had substantial systematic rights, during plea bargaining. But it could have been waived. It could have been waived. It could have been waived if they weren't going to bring in. No, as I argued in the argument, there were other ways that the case could have come in. Even if it had not been other crimes. Just as one example, Mr. Gonzalez testified, they tried to impeach him on this prior conviction. The case could have still become relevant. So what? That doesn't have anything. If they impeach him with the fact of a prior conviction, that doesn't mean his attorney has to take the stand and testify against him. Right. So I think the dividing line we're seeing is, was the state going to use it in this prosecution, or were they not? And if they weren't, that's a waivable conflict. I don't think that the fact that he may have not been a witness, I don't think that that's the dividing line. I think the conflict still exists. It would become, that case would become an issue at the trial. And that creates that conflict. But it's waivable. It's waivable. I don't think in that circumstance it could be waived, just because there would be such a deep conflict. Okay. It's your problem that he waived it without being told by a judge, that he was being told by his attorney, because we don't know what his attorney was telling him. We don't know any of the details. We have no idea. Yes. We can't speculate. Yes. I think it minimally requires a plaintiff. Even the admonishment has to come before any written affidavit or written waiver, because it's the judge's job to make sure that he understands his rights and what's going on. And it would be a bad idea to rely entirely on a defense attorney who may have some other thing going on, including a monetary interest, talking exclusively to his defendant about what his rights are. Correct. I think that's absolutely the case. And I'll argue that essentially by the court not admonishing him, allowing Mr. Grace to continue to represent him without any limitation or any protection of his civil rights, it essentially accepted the waiver for that nine months. It essentially said, you gave me this affidavit so I'm not going to do anything like admonish you or take any steps to make sure that your rights are protected. That was essentially the result of taking nine months and never admonishing him. It was essentially accepting the waiver and then at the end deciding, okay, well, there's no way to waive this, so I guess I have to do this. I think the facts changed. I mean, we have a disagreement. Okay. Just very, very quickly on Batson, I'll just emphasize again that under Supreme Court and Illinois Supreme Court law, once you move into the second and third stage, you're into the second and third stage. There's no going back and all of that. That is what makes the situation muddled. The court tried to make first stage findings and tried to mix the first and second and third stage procedure but not even doing any of them completely. According to Davis, which is based on the Supreme Court case of Fernandez, that was an improper procedure and requires a remand for more than that. Is there no other questions? Okay. Thank you both, Mr. Wallenstein and Ms. O'Connell, for your excellent briefs and your argument here today. We will take the matter under advisement. Court will stand in recess.